RBS HOLDINGS, INC., formerly known as Gordon & Ferguson of Delaware, Inc., Plaintiff,

v.

WELLS FARGO CENTURY, INC., Defendant.

No. 06 Civ. 6036(VM).

United States District Court, S.D. New York.

April 27, 2007.

Evan Scott Weintraub, David Yeger, William B. Wachtel, Wachtel & Masyr, LLP, New York City, for Plaintiff.

Bruce Mathew Sabados, Katten Muchin Rosenman, LLP, New York City, for defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff RBS Holdings, Inc. ("RBS"), formerly known as Gordon & Ferguson of Delaware, Inc., commenced this action against Wells Fargo Century, Inc. ("Wells Fargo"), invoking the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. RBS claims fraud, breach of the duty of good faith and fair dealing, tortious interference, and negligence. Currently before the Court is Wells Fargo's motion to dismiss the Amended Complaint, pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, Wells Fargo's motion is GRANTED.

## I. BACKGROUND [1]

### A. FACTS AND PROCEDURAL HISTORY

RBS is an importer and wholesaler of clothing for various name brands such as Kenneth Cole, Nicole Miller, and Rocawear. Defendant Wells Fargo is a company

---

[1] The factual recitation below is derived primarily from RBS' Amended Complaint, dated Oct. 16, 2006 ("Pl.'s Am. Compl."); Wells Fargo's Notice of Motion, dated Nov. 22, 2006 ("Def.'s Mot. to Dismiss"); Defendant's Memorandum of Law in Support of Defendant's Motion to Dismiss Amended Complaint, dated Nov. 21, 2006, ("Def's Mem."); and Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, dated Jan. 16, 2007 ("Pl's Opp'n"). Except where specifically quoted, no further reference to these documents will be made.

based in New York that provided financial services to RBS.

On March 13, 2003, RBS and Wells Fargo entered into a factoring agreement (the "Factoring Agreement") which granted Wells Fargo a lien on and security interest in RBS's assets. Additionally, RBS's principals executed certain guaranties of RBS's performance under the Factoring Agreement. By late 2005, RBS had incurred substantial monetary obligations to Wells Fargo under the Factoring Agreement.

RBS states that a "relationship of trust and confidence" developed between RBS and Wells Fargo and RBS discussed its confidential business plans with Wells Fargo during their business relationship. (Pl.'s Am. Compl. at ¶ 14.) In early 2006, RBS informed Wells Fargo of its plan to sell its assets. In approximately mid to late January 2006, Wells Fargo expressed its approval of RBS's plan, and agreed to keep the information confidential.

RBS started negotiating with the Sarju Corporation of Bombay, India ("Sarju") regarding the sale of substantially all of RBS's assets. Sarju formed Gordon & Ferguson, Inc. ("GFI") to complete the purchase.

The Factoring agreement between RBS and Wells Fargo prohibited RBS from selling its assets without obtaining Wells Fargo's consent. Wells Fargo told RBS that it would "affirmatively work with RBS on the transition to a new owner." (Id. at ¶ 20.) While RBS was negotiating with GFI, RBS kept Wells Fargo informed of the progress of the transaction.

GFI insisted that RBS convey its license agreement with Rocawear, one of RBS's most important licensors and also a Wells Fargo factoring client, as part of the proposed transaction. RBS informed Wells Fargo that GFI was insisting on purchasing RBS's licensing agreement with Rocawear as part of the asset purchase.

On approximately January 30, 2006, Geoff Goldstein ("Goldstein") of Wells Fargo informed Ian Schaffer ("Schaffer") of RBS that he would contact Rocawear to discuss payments due from RBS to Rocawear. RBS warned that it was crucial for the pending asset purchase agreement between RBS and GFI to be finalized and executed before Rocawear found out about the proposed sale. RBS also told Goldstein that RBS should be the one to notify Rocawear of the transaction. According to RBS, Wells Fargo was informed that, if a party other than RBS were to disclose the proposed transaction to Rocawear, the business relationship between RBS and Rocawear would be damaged and RBS would face difficulty in finalizing the asset purchase agreement.

On approximately January 31, 2006, Christopher Goll ("Goll") of Wells Fargo disclosed the proposed transaction to Rocawear's President. That day, RBS had a meeting with Wells Fargo at which Goll confessed that he had told Rocawear that "RBS was being sold to a substantial Indian conglomerate." (Id. at ¶ 30.)

After finding out about the proposed sale of RBS's assets, Rocawear suggested that it might terminate its licensing agreement with RBS. According to RBS, terminating the licensing agreement would negatively impact RBS's business and would prevent RBS from reaching an agreement with GFI on the terms of the asset sale. RBS tried to persuade Rocawear not to terminate its licensing agreement and the two eventually agreed that RBS could avoid termination of the licensing agreement only if RBS completed the proposed asset sale no later than February 15, 2006. The parties later extended this deadline to February 28, 2006.

On approximately February 2, 2006, RBS and GFI entered into an asset purchase agreement (the "Asset Purchase Agreement"), a copy of which Wells Fargo received. According to RBS, Wells Fargo indicated that it was pleased with the agreement, that it understood that the transaction needed to close as soon as possible and would cooperate with RBS to expedite the closing of the transaction.

On February 28, 2006, RBS and GFI signed an amended Asset Purchase Agreement, a copy of which Wells Fargo received. However, Wells Fargo had not yet given its written consent which RBS was required to deliver by March 1, 2006. The Asset Purchase Agreement provided that GFI need not proceed with the purchase if RBS did not deliver Wells Fargo's written consent on time. According to RBS, Wells Fargo then " 'went underground' in that it refused to answer or return [RBS'] telephone calls reminding" Wells Fargo of the March 1, 2006 deadline for the written consent. (*Id.* at ¶ 36.)

On March 1, 2006, GFI terminated the Asset Purchase Agreement because Wells Fargo had not given a written consent. RBS and GFI then revised the terms of the purchasing agreement. According to RBS, the revision increased RBS's remaining financial obligations to Wells Fargo and reduced GFI's future obligations to Wells Fargo. RBS alleges that the benefits of the proposed transaction to RBS decreased by more than $2.5 million due to the renegotiation of the agreement.

In addition, RBS alleges that Wells Fargo disclosed confidential information about the proposed asset sale to CIT Group/Commercial Services, Inc. ("CIT") which is a junior secured creditor of RBS. According to RBS, Wells Fargo informed CIT that, as part of the asset sale, RBS was posting a $1 million letter of credit in favor of Wells Fargo to guaranty RBS's post-closing obligation to Wells Fargo. RBS owed significant post-closing obligations to CIT as well. However, unlike RBS's obligations to Wells Fargo, the obligations to CIT could not be secured by a letter of credit. When CIT learned that RBS would post a letter of credit for Wells Fargo, CIT insisted that RBS pay $300,000 to CIT at the closing of the transaction.

On March 15, 2006, Wells Fargo did give its written consent and the Asset Purchase Agreement finally closed. Wells Fargo's consent was memorialized in a signed "Consent and Release pursuant to Second Amended and Restated Asset Purchase Agreement ..." (the "Consent and Release," attached as Exhibit 1 ("Ex.1") to Def.'s Mot. to Dismiss.) The Consent and Release contains a release clause ("the Release") which provides:

Seller and Guarantor (collectively, "Releasors") hereby release Wells Fargo and CIT, their respective affiliates, agents and officers and the respective successors and assigns of the foregoing (collectively, "Releasees") from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law or equity (collectively, "Claims"), which the Releasors and their respective heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may, have against the Releasees, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date hereof; provided that the foregoing release shall not apply to any Claims arising under this Consent and Release or under any of the Century

Documents or the CIT Documents from and after the date hereof.

(*Id.* at 3.)

Additionally, after the transaction closed, Wells Fargo advised the garment industry that RBS had inventory that "needed to be moved." (Pl's Am. Compl. at ¶ 50.) RBS contends that several customers refused to purchase RBS's merchandise or agreed to buy the goods only at a discount because Wells Fargo informed them that RBS was desperate to sell its inventory.

## II. DISCUSSION

### A. LEGAL STANDARD

■ A district court may grant a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) only if it appears beyond doubt that the non-moving party could prove no set of facts that would entitle it to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994). In reviewing the pleadings, the court must accept the non-moving party's well-pleaded allegations as true. *See Hishon,* 467 U.S. at 73, 104 S.Ct. 2229. Furthermore, a court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference ... and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000). *See also Calcutti v. SBU, Inc.,* 273 F.Supp.2d 488, 498 (S.D.N.Y.2003); *H & H Acquisition Corp. v. Financial Intranet Holdings,* 1999 WL 988686, *3 (S.D.N.Y. Oct.29, 1999). In addition, even where a document is not incorporated by reference, "the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (citations omitted).

### B. THE COURT'S CONSIDERATION OF THE RELEASE

Wells Fargo moves to dismiss on the ground that RBS's claims arising prior to March 15, 2006 are precluded by the provision of the Consent and Release which releases Wells Fargo from all prior claims. RBS asserts that the Release does not bar its claims against Wells Fargo because the Consent and Release is not reviewable by the Court on a motion to dismiss.

■ In the instant case, RBS's Amended Complaint repeatedly refers to the necessity of Wells Fargo's written consent. The Amended Complaint alleges that Wells Fargo refused to provide a written consent on time as it had promised. (*See, e.g.,* Pl's Am. Compl. at ¶¶ 1; 2; 52; 58.) The Amended Complaint also claims that the consent was required for RBS to sell its asset under the Factoring Agreement, and that Wells Fargo was aware of its obligation to deliver the written consent by March 1, 2006. (*See id.* at ¶¶ 19; 26; 33; 35; 36; 91; 92; 93.) The Amended Complaint maintains that Wells Fargo knowingly delayed providing its written consent in order to undermine RBS' bargaining position. (*See id.* at ¶ 37.) The Amended Complaint even states that Wells Fargo had been provided a draft form of written consent. (*See id.* at ¶ 33.) Thus, it cannot reasonably be disputed that this written consent was integral to the complaint.

RBS contends, however, that its claims do not depend upon the existence of the Release and the fact that Wells Fargo eventually signed a Consent and Release is not integral to RBS's claims. RBS does not dispute that the timing of Wells Fargo's written consent to the Asset Purchase

Agreement is integral the Amended Complaint. (*See* Pl.'s Opp'n at 12–13 ("The essential allegations of the Amended Complaint are that Wells Fargo promised that it would timely provide written consent ...")) Apparently, however, RBS believes the Court can separate the written consent discussed in the Amended Complaint from the eventual Consent and Release executed by Wells Fargo and RBS. RBS's attempt to divorce the actual, albeit delayed, Consent and Release from the timely written consent it alleges it should have received, defies logic.

RBS clearly had actual notice of the Consent and Release when the Amended Complaint was drafted; it cannot avoid the Court's consideration of this document simply by failing to explicitly reference it in the Amended Complaint. *Cf. Yak v. Bank Brussels Lambert, BBL,* 252 F.3d 127 (2d Cir.2001) ("Carefully avoiding all mention of the Consulting Agreements does not make them any less integral to her complaint."). Therefore, the Court finds that RBS relied on the Consent and Release to make its claims, and that the Release provision contained therein is integral to RBS' Amended Complaint. Accordingly, it is appropriate for the Court to consider the Release.

### B. WHETHER THE RELEASE BARS RBS'S CLAIMS

The Release expressly states that it does not apply to "any Claims arising under this Consent and Release or under [the Factoring Agreements with Wells Fargo and a subordinate lender] from and after the date hereof." (Def.'s Mot. to Dismiss, Ex. 1 at 3.) RBS asserts that, even if the Court considers the Consent and Release, the Release does not bar RBS's claims against Wells Fargo because the claims "arise under" the Release itself. Moreover, RBS argues that it was un-

aware of its claims when the parties executed the Consent and Release on March 15, 2006. (*See* Pl.'s Opp'n at 12–13.)

### 1. *Whether the Claims Arise Under the Release*

■ RBS contends that because the Amended Complaint alleges that Wells Fargo purposefully and wrongfully withheld the Consent and Release in order to benefit itself at RBS's expense, RBS's claims "arise under" the Consent and Release and are thus not barred by it.

■ RBS ignores the end of the sentence which limits the Release exception to claims arising "from and after the date hereof," which was March 15, 2006. The carve out from the broad language of the Release clearly applies only to claims that are based on a breach of the Consent and Release that might occur after its signing. When a release is "signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if the language of the release is clear, the intent of the parties is indicated by the language employed." *Medinol Ltd. v. Boston Scientific Corp.,* 346 F.Supp.2d 575, 603 (S.D.N.Y.2004) (citations omitted). Here, the Release is clear: all claims by RBS are released, except those relating to the Consent and Release which arise after March 15, 2006.

The allegations in the complaint focus almost exclusively on Wells Fargo's conduct prior to March 15, 2006—namely its withholding of consent and its disclosure of confidential information. As the Release is clear, the Court presumes it was in fact the intent of the parties to release Wells Fargo from these claims as a condition of its consent to the Asset Purchase Agreement. Thus, except as detailed below, RBS's claims do not fall within the exception to the Release.

### 2. RBS's Awareness of the Alleged Wrongful Conduct

RBS argues that it realized after the closing of the transaction that Wells Fargo would be GFI's factor. "It was only at that time," RBS explains, "that RBS put two and two together and realized the extent of defendant's wrongful conduct." (Pl.'s Opp'n at 13.) Consequently, it argues that as its claims were unknown at the time the Consent and Release was executed, they cannot be barred by it. *See Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A. Inc.,* 354 F.Supp.2d 293, 299 (S.D.N.Y.2004) ("A release that employs general terms will not bar claims outside the parties' contemplation at the time the release was executed.").

In support of its argument, RBS relies on *Maddaloni* and *E\*Trade Financial Corp. v. Deutsche Bank AG,* 420 F.Supp.2d 273, 284 (S.D.N.Y.2006). Both cases are distinguishable from the matter currently before the Court. *Maddaloni* involved a mutual release which provided that "[t]he parties hereby release all claims they might have against each other as of this date." 354 F.Supp.2d at 298. The court in *Maddaloni* declined to find that the mutual release covered the plaintiff's claims because the language and context of the provision were "so non-specific." *Id.* at 299. As for *E\*Trade,* the agreement at issue did "not contain any general release of 'all claims' or 'known or unknown claims,'" it merely stated that the parties should "resolve their differences" with respect to certain specific issues. 420 F.Supp.2d at 284.

By contrast, in *Pickwick Communications Inc. v. Weinberg,* No. 91 Civ. 1642, 1994 WL 620950, \*6 (S.D.N.Y. Nov.8, 1994), defendants executed a release provision worded almost identically to the Release in the instant case. The provision in *Pickwick* released plaintiff and "its offi-

cers, directors, shareholders, employees, servants, agents and representatives," as well as their "successors, assigns and attorneys" of all "Claims" that the defendants "ever had, now have or hereafter can, shall or may have against any of the releasees." *Id.* Defendants made counterclaims and third party claims on theories of fraud, breach of contract, intentional tort, and violation of the Racketeer Influenced and Corrupt Organizations Act. *Id.* at \*9. Defendants also contended that the release did not preclude their claims because they did "not fully appreciate the magnitude of the alleged fraudulent scheme" when they executed the release. *Id.* at \*12. This contention is similar to the argument that RBS makes. (*See* Pl.'s Mem. in Opp'n to Dismiss at 12–13.) The *Pickwick* court held that "a broad release of the kind at issue here bars all claims, irrespective of whether these claims had ripened at the time of the release's execution or whether the releasor was even aware of them at the time of execution." *Pickwick,* 1994 WL 620950 at \*12. Similarly, here the Court finds the broad release bars RBS's claims to the extent they are based on conduct which occurred prior to March 15, 2006.

■ Both the clear language of the Release as well as the nature of RBS's allegations support the Court's conclusion. The record shows that the central events giving rise to RBS' claims occurred before March 15, 2006 when the parties executed the Release. RBS admits that at that time it "knew of some of the conduct that underlies [its] claims and knew of the more onerous financial burdens imposed by the renegotiated sale . . . ." (Pl.'s Opp'n at 13.) RBS cannot reasonably contend that its claims were completely outside of the parties contemplation at the time the Release was executed or that its injuries were unknown. RBS knew that Wells Fargo's

delayed consent had worked to RBS's financial detriment. It also knew that Wells Fargo had shared allegedly confidential information with Rocawear and CIT to RBS's detriment. It appears the only information relevant to these claims of which RBS was not fully cognizant was that Wells Fargo would be a factor to GFI. Consequently, it cannot be said that these claims were unknown to RBS at the time the Release was signed. While every detail of the claim may not have surfaced, the gravamen of RBS's alleged injuries were cognizable at the time the Consent and Release was executed. *Cf. Omaha Indem. Co. v. Johnson & Towers, Inc.,* 599 F.Supp. 215, 221 (S.D.N.Y.1984) ("Lack of awareness of elements of the damage, the true extent of the damage or the existence of a cause of action" not sufficient reason to set aside a general release).

■ A valid release provision may warrant dismissal, pursuant to Rule 12(b)(6), of claims encompassed by the release. *Ladenburg Thalmann & Co. v. Imaging Diagnostic Systems, Inc.,* 176 F.Supp.2d 199, 204 (S.D.N.Y.2001). *See also 2 Broadway LLC v. Credit Suisse First Boston,* No. 00 Civ. 5773, 2001 WL 410074, *7; *13 (S.D.N.Y. Apr. 23, 2001) (dismissing plaintiff's complaint under Rule 12(b)(6) where a valid release covered the plaintiff's claims); *Omaha Indem.,* 599 F.Supp. at 220 (finding that a release bars all of plaintiff's claims existing at the time of the release, both known and unknown). If a party was fraudulently induced to execute the release provision, however, the release is a voidable contract, and the defrauded party may void the release. *See Ladenburg,* 176 F.Supp.2d at 204. Here, RBS does not allege that Wells Fargo fraudulently induced RBS to execute the Release. Therefore, the Release bars RBS's claims to the extent they arose prior to March 15, 2006.

Thus, RBS's claims against Wells Fargo relating to Wells Fargo's delayed consent to the Asset Purchase Agreement and its alleged disclosure of confidential information to Rocawear and CIT are dismissed with prejudice. These claims underlie RBS's First (fraud), Second (breach of the duty of good faith and fair dealing), Third (tortious interference with contract), and Fifth (negligence) Causes of Action, which are therefore all dismissed with prejudice.

### 3. *Claims Not Covered by the Release*

■ The only claim that the Court finds to be potentially viable in light of the Release concerns RBS's allegation that, *following* the closing of the Asset Purchase agreement, "Wells Fargo personnel contacted individuals in the garment industry to advise them that [RBS] had inventory that 'needed to be moved', thereby informing the market that the goods were distressed and adversely affecting the value of those goods and [RBS's] ability to sell them." (Pl.'s Am. Compl. at ¶ 50.) This claim relates to RBS's Fourth Cause of Action for tortious interference with prospective economic advantage.

RBS's claim for tortious interference with prospective economic advantage, however, must also be dismissed as RBS's fails to adequately plead this cause of action with respect to Wells Fargo's alleged post-Release and Consent disparagement of RBS's inventory. To properly plead this claim, "the complaint must allege interference with a specific identified business relationship with a third party." *Camp Summit of Summitville v. Visinski,* No. 06 Civ. 4994, 2007 WL 1152894, at *14 (S.D.N.Y. April 16, 2007); *see also Gianni Versace S.p.A. v. Versace,* No. 01 Civ. 9645, 2003 WL 470340, at *2 (S.D.N.Y. Feb. 25, 2003) ("A properly pleaded counterclaim for this tort must allege relationships with

specific third parties with which the respondent interfered.").

Here, RBS fails to specifically identify the third parties Wells Fargo allegedly contacted and told that RBS had inventory which "needed to be moved." Therefore, the claim must be dismissed. However, RBS is free to replead this claim in the event it is able to adequately plead the particulars necessary to sustain a cause of action.

### III.  *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that the motion of defendant Wells Fargo Century Inc. (Docket No. 18) pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint of plaintiff RBS Holdings, Inc. ("RBS") is GRANTED; and it is further

**ORDERED** that RBS shall have leave to file a further amendment of its complaint within fifteen (15) days of the date of this Order so as to replead its claim of tortious interference with prospective economic advantage in accordance with the Court's decision above.

The Clerk of Court is directed to close this case.

**SO ORDERED.**