CANAL+ IMAGE UK LTD., Plaintiff,

v.

Steven LUTVAK and Robert L. Freedman, Defendants.

No. 10 Civ. 1536(RJH).

United States District Court, S.D. New York.

March 29, 2011.

George Phillip Birnbaum, Minogue Birnbaum LLP, New York, NY, for Plaintiff.

Barry Isaac Slotnick, Loeb & Loeb LLP, New York, NY, for Defendants.

RICHARD J. HOLWELL, District Judge:

Defendants Steven Lutvak and Robert L. Freedman ("Defendants") move to dismiss claims by Canal+ Image UK Ltd. ("Canal+") for infringement of Canal+'s copyright in the film *Kind Hearts and Coronets* (the "Film") as well as for breach of a contract regarding the rights to develop a stage musical adaptation of that film. For the reasons that follow, the Court finds that no reasonable jury could find that Defendants' musical is substantially similar to the protectible aspects of the Film and that the Copyright Act preempts a claim for breach of contract in the circumstances of this case. Accordingly, Defendants' motion is granted.

## BACKGROUND

Roy Horniman's novel *Israel Rank* ("the Novel") was first published in 1907. The Novel, which has passed into the public domain, is written in the form of the prison memoirs of a man condemned to death. It tells the story of its eponymous protagonist, the son of Jewish father and a noble mother whose marriage to a Jewish man caused her family, the Gascoynes, to disinherit her. The protagonist is reared to be acutely aware of his disinheritance, an awareness that turns to vengeance when he is rejected from a position at the family's banking house and by a social-climbing lover, Sibella, who marries a more promising man. The protagonist then hatches a plan to murder the eight people between him and the family's noble title. The protagonist begins by murdering the heir who refused him the position at the banking house and his mistress and then kills six other Gascoynes, several in disturbing fashion but all without detection. Along the way, as he moves closer to the Gascoyne title, the protagonist joins the banking house and his increased stature and wealth enable him to have an affair with his former flame, Sibella, and marry the sister of one his victims. When the protagonist takes the final step and poisons Lord Gascoyne himself, he takes the title but is arrested for the crime. However, the protagonist is exonerated when a governess at the family's estate falsely confesses to the murder because she has fallen in love with the protagonist.

In 1949, Ealing Studios released the Film, a comic adaption of the Novel starring Dennis Price as the protagonist with Valerie Hobson as his wife and Joan Greenwood as his lover. In one of his most memorable supporting roles, Sir Alec Guinness plays each of the protagonist's victims. The Film tells essentially the same story as the Novel, with a few differences described in more detail below. Canal+, however, alleges that "having all of the murder victims played by the same leading comic actor is central to the artistic expression of the Film" and "affects, and is inextricably intertwined with, not just the tone but all of the dramatic situations in the Film, including its 'total concept and feel.'" (Compl. ¶ 20.) Canal+ owns the copyrights to the Film pursuant to valid registration number PA–931591.

Defendants are a lyricist and a songwriter. On April 1, 2003, Canal+ and Defendants entered into a licensing agreement (the "Agreement") pursuant to which Canal+ provided Defendants with "the exclusive authorization, *to the extent of the interests of [Canal+]* ... to adapt the Film ... as a live stage musical presentation ...." (emphasis added). The authorization extended through October 1, 2004, at which time Defendants were to provide Canal+ with all materials necessary for Canal+ to decide whether to produce the "live stage musical presentation." If Canal+ elected to do so, it would "have the sole right to enter into agreements to ... present the Play with [Defendants] on terms to be negotiated in good faith." However, if Canal+ elected not to produce the play, the Agreement provided that Defendants' "rights [t]hereunder shall immediately terminate" and Defendants "shall immediately thereafter cease dealing in and with any materials written or created by you which represent, incorporate or embody the Film or any elements in the Film, including without limitation the text, characters, and situations in the Film, all of which elements shall be deemed to have reverted to [Canal+]."

Defendants submitted materials as required by the Agreement pursuant to releases dated September 1, 2004 which incorporated the terms of the Agreement. (Garmise Aff. Exs. A, B.) Canal+ decided

not to produce Defendants' live musical adaption. However, Defendants proceeded with developing their adaption ("the Musical") which appears to have been variously titled *Kind Hearts and Coronets, The Truth About Monty,* and, ultimately, *A Gentleman's Guide to Love and Murder.* According to several media sources to which Canal+ has referred the Court and whose veracity Defendants have not contested, Defendants planned to use one actor to play all of the victims in the Musical and previewed the Musical in that fashion.

Canal+ filed suit against Defendants on February 19, 2010 alleging copyright infringement and breach of contract. Canal+ alleges that Defendants "have simply taken the same musical which they previously called *Kind Hearts and Coronets,* changed the title and the names of certain characters, made other immaterial changes, and have now announced a pre-Broadway commercial production of that musical." (Compl. ¶ 16.) Specifically, Canal+ alleges that "in the current re-titled musical [Defendants] have retained the style and occurrence of humorous, non-realistic deaths from the Film, deaths which are very different from the horrifyingly realistic ways in which the victims die in *Israel Rank.*" (*Id.* at 18.) Moreover, Canal+ alleges that "defendants' re-titled musical has retained the central and most memorable expressive part of *Kind Hearts and Coronets:* the comedy inherent in having all eight of the aristocratic murder victims played by a single actor. . . ." (*Id.* at 19.)

Defendants have moved [18] under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim for which relief can be granted.[1]

## LEGAL STANDARD

"Courts ruling on motions to dismiss must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Dickerson v. Mut. of Am.,* 703 F.Supp.2d 283, 290 (S.D.N.Y.2010). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* — U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

■■■ "To prove infringement, a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Hamil Am. Inc. v. GFI,* 193 F.3d 92, 99 (2d Cir.1999) (emphasis in original and quotation marks omitted). "[B]ecause the question of substantial similarity typically presents an extremely close question of fact, questions of non-infringement have traditionally been reserved for the trier of fact." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57, 63 (2d

---

1. Defendants have also moved in the alternative for summary judgment under Federal Rule of Civil Procedure 56. Given that, for the reasons set forth below, it is proper under the law of this Circuit both to consider the works at issue and to resolve the substantial similarity question as a matter of law, there is no need to treat the instant motion as one for summary judgment.

Cir.2010) (internal citation omitted). Nevertheless, "it is entirely appropriate for a district court to resolve that question as a matter of law, 'either because the similarity between two works concerns only noncopyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'" *Id.* (quoting *Warner Bros. Inc. v. Am. Broad. Cos.,* 720 F.2d 231, 240 (2d Cir.1983)).

"When a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because 'what is required is only a ... comparison of the works.'" *Gaito,* 602 F.3d at 64 (quoting *Folio Impressions, Inc. v. Byer Cal.,* 937 F.2d 759, 766 (2d Cir.1991)). Thus "where ... the works in question are attached to a plaintiff's complaint, it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." *Gaito,* 602 F.3d at 64.

Canal+ has not attached a copy of either the Film or the Musical to its complaint, nor has it formally incorporated either work by reference. But "when a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (quotation marks omitted). Where Canal+ repeatedly characterizes or invokes the Novel, the Film, and the Musical in its complaint, alleges that the Musical "is nothing more than *Kind Hearts and Coro-*nets under a different name," and has alleged a claim for copyright infringement which requires proof that the Musical is substantially similar to the Film, it is plain that the Novel, the Film, and the Musical are integral to the complaint. Accordingly, the Court will consider these works for purposes of Defendants' motion to dismiss.

The Court will also consider the Agreement. "[W]here the claim is for breach of contract, the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiffs' claim." *Verzani v. Costco Wholesale Corp.,* 641 F.Supp.2d 291, 297–98 (S.D.N.Y.2009). Though Canal+ has not attached a copy of the Agreement to the complaint or formally incorporated the Agreement by reference, Canal+ quotes from and relies upon that Agreement. (Compl. ¶ 10, 11, 12, 13, 23.) A plaintiff "cannot avoid the Court's consideration of [a] document simply by failing to explicitly reference it...." *RBS Holdings, Inc. v. Wells Fargo Century, Inc.,* 485 F.Supp.2d 472, 477 (S.D.N.Y.2007). The Agreement is therefore properly considered.

However, the Court will not consider what Canal+ calls an "expert" report by Dr. Michael Newton, a docent at the University of Leiden and the author of the only book-length study on the Film. (*See* Aff. of Michael Newton in Supp. of Pl.'s Opp'n to Defs.' Mot. to Dismiss.) "The well-established general rule in this circuit has been to limit the use of expert opinion in determining whether works at issue are substantially similar." *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 713 (2d Cir.1992). It is true that "expert testimony may be used to assist the fact finder in ascertaining whether the defendant had copied any part of the plaintiff's work," but copying is not at issue. *Id.* Thus "it remains solely for the trier of

fact to determine whether the copying was 'illicit'" and "[s]ince the test for illicit copying is based upon the response of ordinary lay observers, expert testimony is thus 'irrelevant' and not permitted." *Id.* While the Second Circuit has found expert testimony permissible in cases involving computer software, *see id.,* this is not such a case.

## DISCUSSION

### A. Copyright Infringement

"To prove infringement, a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiffs." *Hamil Am. Inc.,* 193 F.3d at 99 (emphasis in original and quotation marks omitted). Defendants have not contested actual copying. Rather, they contend that that the Musical is not substantially similar to the Film as a matter of law.

The requirement of substantial similarity reflects the proposition that "not all copying results in copyright infringement, even if the plaintiff has a valid copyright." *Boisson v. Banian, Ltd.,* 273 F.3d 262, 268 (2d Cir.2001). Rather, the question "is whether 'the copying is quantitatively and qualitatively sufficient to support a finding of *infringement.*'" *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.,* 166 F.3d 65, 70 (2d Cir.1999) (emphasis added) (quoting *Ringgold v. Black Entm't Television, Inc.,* 126 F.3d 70, 75 (2d Cir.1997)). Put another way, the question is "whether an average lay observer would ... recognize the alleged copy as having been appropriated from the copyrighted work...." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1002 (2d Cir.1995). Hence "[t]he standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 111 (2d Cir.2001) (quotation marks omitted).

However, "where [a court] compare[s] products that contain both protectible and unprotectible elements, [its] inspection must be more discerning," *Knitwaves, Inc.,* 71 F.3d at 1002 (quotation marks omitted), because "copying is illegal because a substantial similarity exists between the defendant's work and *the protectible elements of plaintiff's.*" *Hamil Am. Inc.,* 193 F.3d at 99 (emphasis added). Therefore, where the allegedly infringed work consists of both protectible and unprotectible elements, the court "must attempt to extract the unprotectible elements from [its] consideration and ask whether the *protectible elements, standing alone,* are substantially similar." *Knitwaves, Inc.,* 71 F.3d at 1002 (emphasis in original). That is, "[t]he court, confronted with an allegedly infringing work, must analyze the two works closely to figure out in what respects, if any, they are similar, and then determine whether these similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.,* 338 F.3d 127, 134–35 (2d Cir.2003).

Nevertheless, the nature of the creative process is such that even this discerning approach can prove clumsy. "'[I]n Hollywood, as in the life of men generally, there is only rarely anything new under the sun.'" *Williams v. Crichton,* 84 F.3d 581, 588 (2d Cir.1996) (quoting *Berkic v. Crichton,* 761 F.2d 1289,

1294 (9th Cir.), *cert. denied,* 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 69 (1985)). Since "all creative works draw on the common wellspring that is the public domain," *Tufenkian Imp./Exp. Ventures, Inc.,* 338 F.3d at 132, copyright protection does not extend only to new forms of expression but also, and more commonly, to assembling old forms in original ways. *Cf. Salinger v. Random House, Inc.,* 811 F.2d 90, 98 (2d Cir.1987) ("Though a cliche or an 'ordinary' word-combination by itself will frequently fail to demonstrate even the minimum level of creativity necessary for copyright protection, such protection is available for the 'association, presentation, and combination of the ideas and thought which go to make up the [author's] literary composition.'") (internal citation omitted) (quoting *Nutt v. Nat'l Inst. Inc. for the Improvement of Memory,* 31 F.2d 236, 237 (2d Cir.1929)). Considering only those elements that alone are protectible "would result in almost nothing being copyrightable because original works broken down into their composite parts would usually be little more than basic unprotectible elements like letters, colors and symbols." *Boisson,* 273 F.3d at 272.

 Accordingly, the Second Circuit has recognized that "the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work ... are considered in relation to one another." *Tufenkian Imp./Exp. Ventures, Inc.,* 338 F.3d at 134. The Court of Appeals therefore "ha[s] disavowed any notion that '[courts] are required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.'" *Gaito,* 602 F.3d at 66 (quoting *Knitwaves, Inc.,* 71 F.3d at 1002). Instead, courts

must be "principally guided 'by comparing the contested [work's] total concept and overall feel' with that of the allegedly infringed work, as instructed by [their] good eyes and common sense." *Gaito,* 602 F.3d at 66 (quoting *Tufenkian Imp./Exp. Ventures, Inc.,* 338 F.3d at 133). This "total-concept-and-feel locution functions as a reminder that, while the infringement analysis must *begin* by dissecting the copyrighted work into its component parts in order to clarify precisely what is not original, infringement analysis is not *simply* a matter of ascertaining similarity between components viewed in isolation." *Tufenkian Imp./Exp. Ventures, Inc.,* 338 F.3d at 134 (emphasis in original). Rather, "in the end, [the] inquiry necessarily focuses on whether the alleged infringer has misappropriated 'the original way in which the author has selected, coordinated, and arranged the elements of his or her work.'" *Gaito,* 602 F.3d at 66 (quoting *Knitwaves Inc.,* 71 F.3d at 1004) (other quotation marks omitted).

Accordingly, the infringement analysis proceeds as follows. First, the Court will determine what elements of the Film are protectible. Second, the Court will determine whether there is a substantial similarity between those elements and the Musical. Third, since both the Second Circuit and Canal+ have emphasized the importance of one element—the total concept and feel of the works—the Court will treat total concept and feel separately.

### 1. What Elements of the Film are Protectible

 Courts assessing whether two works are similar "examine the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting...." *Williams,* 84 F.3d at 588. The first question is whether any of these elements of the Film are protectible. Answering that question in this case

requires a brief discussion of the law governing derivative works because Canal+ alleges that the Novel served as "source material for the Film." (Compl. ¶ 15.) [2]

"Originality is the sine qua non of copyright." *Tufenkian Imp./Exp. Ventures, Inc.*, 338 F.3d at 131. "If a work is not original, then it is unprotectible." *Boisson*, 273 F.3d at 268. "Originality does not mean that the work for which copyright protection is sought must be either novel or unique, it simply means a work independently created by its author, one not copied from pre-existing works, and a work that comes from the exercise of the creative powers of the author's mind, in other words, the fruits of the author's intellectual labor." *Id.* (internal citation and quotation marks omitted).

The originality requirement applies in equal measure to derivative works. Section 101 of the Copyright Act defines a derivative work as:

> a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, *motion picture version*, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.

17 U.S.C. § 101 (emphasis added). "The subject matter of copyright ... includes compilations and derivative works...." 17 U.S.C. § 103(a). However, "[t]he copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). Thus "copyrights in derivative works secure protection only for the incremental additions of originality contributed by the authors of the derivative works." *Silverman v. CBS Inc.*, 870 F.2d 40, 49 (2d Cir.1989); *see also Psihoyos v. Nat'l Geographic Soc'y*, 409 F.Supp.2d 268, 278 (S.D.N.Y.2005) ("Only the original elements of a derivative work, *i.e.* the non-trivial additional matter transforming a prior work, are protected by copyright."); *Earth Flag Ltd. v. Alamo Flag Co.*, 153 F.Supp.2d 349, 353 (S.D.N.Y. 2001) ("Although derivative works are protectible, copyright protection extends only to the non-trivial, original contributions of the derivative work's author.").

While this is "a low threshold," "[t]he law requires more than a modicum of originality" and the Copyright Act "has been interpreted to require a distinguishable variation that is more than merely trivial." *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 782 (2d Cir.1994). "In the case of a derivative work based on an underlying work that is in the public domain, only the material added to the underlying work is protected by copyright." *Id.* Accordingly, to the extent that any of the similarities between the Film and the Musical are derived from the public domain Novel, those similarities are not protectible.

#### a. Characters

Most of the characters in the Film appear in the Novel: a protagonist de-

---

2. While the complaint does not use the term "derivative work," Canal+ does not appear to contest that the Film is a derivative work of the Novel. Indeed, Canal+ argues that "the creators of the Film transformed a dark, anti-Semitic novel into a comedy"; that "defendants turned *Israel Rank* into a comedy ... *by the same artistic means* [using one actor to play all the victims] by which the creators of the classic Film did so"; and that the filmmakers "transformed the novel into an entirely different artwork by creating the central expressive device," and cites to the complaint in doing so. (Pl.'s Opp'n at 5, 12 (emphasis added).) Accordingly, the Court will treat the Film as a derivative work.

scended from a non-noble father and a noble mother whose marriage causes the protagonist's disinheritance; Sibella, the protagonist's coquettish childhood friend whose snub catalyzes the criminal plan; a second principal female character related to Henry whom the protagonist ultimately marries; and six similar victims: the head of the family, the manager of the family's private banking business, the manager's son (and his mistress), the character named Henry, a heavy-drinking reverend, and a military officer. At most, then, small details of these characters are protectible. For example, unlike the protagonist of the Novel whose father is Jewish, the protagonist of the Film is the son of an Italian father. Similarly, in the Novel (as in the Musical) the second principal female character related to Henry whom the protagonist courts and to whom he becomes engaged is Edith, Henry's sister. In the Film, however, the same character is Phoebe, Henry's widow. These differences could be protectible, but the characters in general are not.

### b. Plot

 As set forth above, both the Film and the Musical present the same basic story. The protagonist learns of his disinheritance and, spurred in part by rejection by Sibella and the noble family's banking house, conceives and carries out a plan to murder the eight heirs between him and the noble title. With the family in the dark as to the protagonist's plan, the protagonist's move up the family hierarchy leads to an invitation to join the banking house and with it ever more recognition, prestige, and wealth. Sibella takes notice of the protagonist's advancement and, bored by Lionel whom she agreed to marry when his prospects seemed brighter than the protagonist's, begins an affair with the protagonist. At the same time, the protagonist courts and becomes en-

gaged to a mourning relative of Henry. After the protagonist has dispatched all but the head of the noble family, the head of the noble family dies, and the protagonist inherits the title. He is then arrested for and falsely accused of murder. A woman in love with him, however, hatches a plan to exonerate the protagonist and he is freed only to discover that he has left his memoirs, and thus a confession, in his cell.

This basic story is not protectible, however, because it is a story almost entirely derived from the Novel. The only notable differences between the just described common plot of the Musical and the Film and the plot of the Novel are that the protagonist in the Novel actually murders the head of the family, is rightly accused and convicted of that crime, and is exonerated not by Sibella but by a governess at the ancestral home who falsely confesses to the murder. The Film adapts that ending such that the head of the family dies naturally, and Sibella falsely accuses the protagonist of murdering Lionel but exonerates him after blackmailing him into agreeing to murder Edith. Since that adaption is original, it may be protectible. But the basic skeleton of the story is not.

### c. Theme

 Plaintiffs allege that Defendants "have simply taken the same musical which they previously called *Kind Hearts and Coronets,* changed the title and the names of certain characters, made other immaterial changes, and have now announced a pre-Broadway commercial production of that musical." (Compl. ¶ 16.) Defendants, however, argue that "the concept of creating a humorous derivative work based on *Israel Rank* is a nonprotectible idea, which cannot give rise to a claim of copyright infringement." (Defs.' Br. at 16.) That argument implicates what the

Supreme Court has called the "idea/expression dichotomy" which "assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349–50, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Pursuant to this dichotomy, "copyright does not protect ideas; it protects only the author's particularized expression of the idea." *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 135–36 (2d Cir.2004); *see also Boisson*, 273 F.3d at 268 ("[C]opyright protection extends only to a particular expression of an idea, and not to the idea itself."). Thus "the similarity between two works must concern the expression of ideas, not the ideas themselves." *Gaito*, 602 F.3d at 67.

That statement of the law, however, is "a distinction easier to state than to apply." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.1986). Indeed, "no single 'principle can be stated as to when an imitator has gone beyond copying the "idea," and has borrowed its "expression...."'" *Attia v. Soc'y of New York Hosp.*, 201 F.3d 50, 54 (2d Cir.1999) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (Hand, J.)). *Cf.* 1 Nimmer on Copyright § 13.03[A][1] (2003) (dismissing the "idea/expression dichotomy" as "a reformulation not a solution of the problem"). "Decisions must therefore inevitably be *ad hoc.*" *Peter Pan Fabrics, Inc.*, 274 F.2d at 489.

Nevertheless, this case is far less difficult than some. The notion of a comic adaption of a novel about murder is an idea, or an interpretation, that can be expressed in many different ways. Indeed, Canal+ effectively concedes that "[w]hat is at issue is not that defendants turned *Israel Rank* into a comedy...." (Pl.'s Opp'n at 5.) Accordingly, a comedic adaption of the Novel is not protectible.

#### d. Setting

The Film appears to be set in Edwardian England. There are several clues to that setting: antiquated versions of motorcars and cameras, the general's tale of his exploits in the Boer War, and the portrayal of the female suffragist. This setting is not protectible not only because it is historical but because it is also the setting of the Novel. *See, e.g., Bevan v. Columbia Broad. Sys., Inc.*, 329 F.Supp. 601, 606–7 (S.D.N.Y.1971) ("What resemblance remains between the two works arises from the nature of subject matter, a POW camp within Hitler's Germany.... Similarity of this kind fails to meet the appropriate legal tests either of substantiality or wrongful appropriation.").

#### e. "Composite Victim"

Canal+ stakes much of its infringement argument on the fact that initial previews of the Musical suggest that one actor will play all of the victims just as Sir Alec Guinness did in the Film.[3] Based on that fact, Canal+ argues that the defendants "have blatantly appropriated the Film's central means of expression, and used it as the centerpiece of their musical...." (Pl.'s Opp'n at 11.) While this

---

**3.** Canal+ has attached to its complaint an article from the entertainment periodical *Variety* reporting that a Tony Award-winning actor was slated to play all of the victims in a run of the Musical. (*See* Compl. Ex. A.) Defendants argue that this element is not part of the script of the Musical (*see* Defs.' Reply at

10), but the Court assumes for purposes of this motion that the alleged infringing work also involves a composite victim. To the extent that productions of Defendants' musical do not use this device, Plaintiffs' claim for copyright infringement would be more easily dismissed.

argument warrants analysis in considering the total concept and feel of the Film, *see* Part A3 *infra*, it lacks merit to the extent that Canal+ seeks protection for the Film's use of a standard convention. The dramatic device of using one actor to play multiple roles in the same production is not protectible in itself because there is nothing original about that device. Indeed, it is no more original than using "a character who talks directly to the audience," "celebrities appearing as themselves," or "men disguising themselves as women" which courts in this Circuit have held not protectible in two cases cited by Defendants. *See A Slice of Pie Prods., LLC v. Wayans Bros. Ent'mt*, 487 F.Supp.2d 41, 48 (D.Conn.2007) (characters in disguise); *Willis v. Home Box Office*, No. 00–CV–2500, 2001 WL 1352916, at *5 (S.D.N.Y. Nov. 2, 2001) ("*Willis I*"), *aff'd* 57 Fed.Appx. 902 (2d Cir.2003) ("*Willis II*") (characters speaking directly to the audience and celebrities appearing as themselves). Nor is it any more original than using a master of ceremonies, celebrity guests, capital letters in title sequences, or black and white costumes, all of which cannot be protected. *See Mallery v. NBC Universal, Inc.*, No. 07–CV–2250, 2007 WL 4258196, at *7 (S.D.N.Y. December 3, 2007) (white block capital letters); *Barris/Fraser Enter. v. Goodson–Todman Enter., Ltd.*, 5 U.S.P.Q.2d 1887, 1889 (S.D.N.Y.1987) (Weinfeld, J.) ("Nor is protection extended to a system of asking questions, the concept of a master of ceremonies and celebrity guests, or the true stories told on the show. It is only in original expression that defendant can claim copyright protection."); *O'Brien v. Chappel & Co.*, 159 F.Supp. 58, 59 (S.D.N.Y.1958) ("[P]laintiff cannot get copyright ... to the idea of having the

actors and actresses in a stage show appear in a scene dressed in black and white costume.").

## 2. Similarity

■ The next question involves application of the "more discerning observer" test: whether "a substantial similarity exists between the defendant's work and *the protectible elements of plaintiff's.*" *Hamil Am. Inc.*, 193 F.3d at 99 (emphasis added). In this case, the question is whether there is a substantial similarity between what the Court has just determined are the protectible elements of the Film "standing alone," *Knitwaves, Inc.*, 71 F.3d at 1002, and the Musical? " '[T]he determination of the extent of similarity that will constitute a *substantial*, and hence infringing, similarity presents one of the most difficult questions in copyright law, and one that is the least susceptible of helpful generalizations.' " *Gaito*, 602 F.3d at 63 (emphasis in original) (quoting 1 Nimmer on Copyright § 13.03[A] ). However, the question is somewhat easier in this case because the Film, as a derivative work, contains limited original elements, and most of those original elements are not similar to elements of the Musical.

### a. Characters

■ As discussed above, the Film's characters are generally not protectible because they are derived from the public domain Novel. Moreover, even those minor character details that are protectible are not portrayed in the Musical. For example, in the Musical, as in the Novel, the second principal female character is Phoebe, Henry's sister, not, as in the Film, Henry's widow Edith.[4] In addition, each

---

4. Defendants attempt to argue that these two characters are different in that Phoebe is a feminist who initially refuses to marry the protagonist but later propositions him herself whereas Edith is a "charming but reserved prohibitionist." (Defs.' Br. at 24.) This slices

work portrays two victims not portrayed in the other: a missionary and an actress in the Musical; a female suffragist and an admiral in the Film. And the Musical also portrays a character named Miss Shingle who first alerts the protagonist to his noble heritage and commits the murder of which the protagonist is later accused but who appears nowhere in the Film. Accordingly, there is no substantial similarity between the protectible aspects of the characters in the Film and the characters in the Musical.

### b. Plot

 As also discussed above, the Film's story is generally not protectible because it is derived from the public domain Novel. And while the ending of the Film is an original, and therefore protectible, adaption of the Novel, it is not the ending of the Musical. The Musical ends as follows: the head of the family does not die naturally but is poisoned by Miss Shingle; the authorities, not Sibella, falsely accuse the protagonist of that murder, not of Lionel's; Phoebe, not Sibella, visits the protagonist in prison and does not blackmail him; and the two women together, rather than Sibella alone, exonerate the protagonist by making false confessions and agree to share his affections. And unlike in the Film, the protagonist recovers his memoirs.

The plot of the Film and the plot of the Musical also differ in numerous other ways. In the Film, the protagonist learns from his mother at a very young age that he has been disinherited. He grows up with resentment for the noble family that only grows when he is rejected from the family banking house. The rejection oc-

curs while the protagonist's mother is still alive and the protagonist's mother stokes the protagonist's resentment. The Musical, however, does not portray the protagonist's childhood. Rather, the protagonist learns not from his mother but from Miss Shingle, after his mother's death, that he has been disinherited. Only then does the protagonist write to the family banking house.

The protagonist in the Musical also commences his plot and murders his victim in ways different from the means used by the protagonist of the Film. In the Musical, the protagonist does not truly hatch his plan until the time that he "murders" his first victim, the reverend, whom he decides not to prevent from falling from a turret. The protagonist then throws the banking family son and his mistress from a Ferris wheel; uses lavender to attract a swarm of bees to sting Henry to death; has Lady Hyacinth dispatched to a district of cannibals; drops a barbell on the fitness fanatic Lord Bartholomew, and loads Lady Salome's gun with real bullets for the climactic suicide scene in Henrik Ibsen's play *Hedda Gabbler*. The head of the banking house then suffers a heart attack. Finally, the protagonist attempts to poison the head of the family on a visit to the ancestral estate but fails to do so.

In the Film, however, the protagonist conceives his plan after his mother's death and murders his first victim, the banking house son, by sending his and his mistress's canoe over a waterfall. Like the Ferris wheel incident in the Musical, this also occurs at a resort outside of London. The protagonist then murders Henry by causing an explosion in his darkroom, poisons the reverend, sends the general a

---

things too thin. Both women seem quite purposefully characterized as intelligent and independent-minded, critical of traditional hierarchies, and strong in times of grief. Indeed,

it is these traits, in contrast to Sibella's single-minded coquetry, that attract the protagonist in both works.

bomb in a tin of caviar, and shoots down the suffragist's protest balloon. The admiral is drowned after he refuses to leave his sinking ship that has been wrecked in a collision at sea in which the protagonist plays no part. Much like the analogous character in the Musical, the head of the banking house then dies of a stroke. Also as in the Musical, the protagonist is then invited to the ancestral home where he attempts to murder the head of the family. In the Film, however, the protagonist succeeds by shooting the man with a shotgun while making the incident look accidental.

The protagonist in each work is also falsely accused of a different crime. In the Musical, the protagonist is accused of murdering the head of the family. In the Film, however, the protagonist is accused of murdering Lionel, who has committed suicide out of financial despair after an unsuccessful entreaty to the protagonist for assistance. This difference results in two different endings. In the Film, Sibella, who has falsely accused the protagonist, visits the protagonist in prison after he has been convicted and sentenced to death. Sibella offers to reveal Lionel's suicide note if the protagonist will agree to murder Edith, his fiancee. The protagonist agrees to the plan and Sibella produces the suicide note in the nick of time. The protagonist is freed but discovers after being solicited to sign a contract for his memoirs that he has left them in his cell. He now must contend with two dilemmas: a confession lying in his cell and whether to ride home with Sibella or Edith, both of whom are waiting in their carriages outside the prison.

In the Musical, it is Phoebe, not Sibella who visits the protagonist in prison on the eve of the verdict, not his execution. Sibella and Phoebe each accuse each other of the murder (which has actually been committed by Miss Shingle), leading the au-

thorities to doubt whether the protagonist actually committed the murder. The protagonist is freed and likewise leaves without his memoirs but evades both dilemmas the protagonist faces in the Film: his lovers seem content to share his affections and a guard rushes out to return the memoirs. The Musical ends with the protagonist's distant cousin plotting his own scheme to murder his way to what is now the protagonist's title.

In sum, most of the plot of the Musical that is similar to the plot of the Film is not original to the Film and nearly all of the plot that is original to the Film is not similar to the plot of the Musical. Accordingly, there is no substantial similarity between the protectible aspects of the plot of the Film and the plot of the Musical.

### 3. Total Concept and Feel

However, the above comparison by dissection is not the end of the matter. The Court must also consider whether there is a substantial similarity between the total concept and feel of the two works. Of course, on a broad level, both the Film and the Musical are comedies. But as discussed above, that abstracted similarity cannot give rise to infringement and, implicitly conceding as much, Canal+ alleges that "having all of the murder victims played by the same leading comic actor is central to the artistic expression of the Film" and "affects, and is inextricably intertwined with, not just the tone but all of the dramatic situations in the Film, including its 'total concept and feel.'" (Compl. ¶ 20.)

Drawing on that allegation, Canal+ contends that the composite victim is "bound together in an inseparable unity with all of the [F]ilm's other elements" (Pl's Opp'n at 21) and "is interwoven throughout the elaborate plot, moving the audience to laughter each time another foppish victim falls." (*Id.* at 18.) As a result, Canal+ contends that "the composite victim is re-

sponsible for creating the total concept and feel of the Film." (*Id.* at 21.) That is, the composite victim is "the heart and soul" of the Film such that any other work portraying a composite victim would be substantially similar to the Film in total concept and feel. (*Id.* at 10.) Indeed, Canal+ argues that if this were the "only similarity between the two works, defendants' appropriation of it would still be actionable." (*Id.* at 21.)

 The argument that the Musical uses the same device to tell the same story with the same feel resonates with some statements of the law in this Circuit, discussed above, to the effect that "the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work ... are considered in relation to one another." *Tufenkian Imp./Exp. Ventures, Inc.,* 338 F.3d at 134.

On the other hand, "if we use identical phrases from one context to resolve issues in another, we risk failing to notice that the relevant concepts are and ought to be somewhat different." *Mannion v. Coors Brewing Co.,* 377 F.Supp.2d 444, 459 (S.D.N.Y.2005) (Kaplan, J.) (quoting Hon. Jon. O. Newman, *New Lyrics for an Old Melody: The Idea/Expression Dichotomy in the Computer Age,* 17 Cardozo Arts & Ent. L.J. 691, 694 (1999)). *Cf. Franklin Mint Corp. v. Nat'l Wildlife Art Exchange, Inc.,* 575 F.2d 62, 65 (3d Cir.1978) ("Troublesome, too, is the fact that the same general principles are applied in claims involving plays, novels, sculpture, maps, directories of information, musical compositions, as well as artistic paintings."). On its face, disavowing the notion that courts should "compare only those elements which are in themselves copyrightable," *Gaito,* 602 F.3d at 66, seems hard to

square with the " 'more discerning observer' test, which requires substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed work." *Lapine v. Seinfeld,* 375 Fed.Appx. 81, 83 (2d Cir. 2010). Yet "[t]he tension between these two propositions perhaps results from their formulation in the context of literary works and their subsequent application to graphic and three-dimensional works." *Warner Bros. Inc.,* 720 F.2d at 241 (Newman, J.).

The cases in which the Second Circuit has most strongly emphasized the need to examine works holistically have involved the visual arts. *See Gaito,* 602 F.3d at 59 (architectural plans); *Tufenkian Imp./ Exp. Ventures, Inc.,* 338 F.3d 127 (rug design); *Yurman Design, Inc.,* 262 F.3d 101 (jewelry design); *Boisson,* 273 F.3d 262 (quilt design), *Knitwaves,* 71 F.3d 996 (sweater designs), *Peter Pan Fabrics,* 274 F.2d 487 (cloth design). With regard to such works, "which are addressed to the aesthetic sensibilities of the observer, the [idea/expression] test is, if possible, even more intangible." *Id.* at 489. Indeed, "one cannot divide a visual work into neat layers of abstraction in precisely the same manner one could with a text." *Sapon v. DC Comics,* No. 00–CV–8992, 2002 WL 485730, at *3 (S.D.N.Y. Mar. 29, 2002) (quoting Newman, 17 Cardozo Arts & Ent. L.J. at 697–98). "A story has a linear dimension: it begins, continues, and ends" but "[a] graphic or three-dimensional work is created to be perceived as an entirety. Significant dissimilarities between two works of this sort inevitably lessen the similarity that would otherwise exist between the total perceptions of the two works." *Warner Bros., Inc.,* 720 F.2d at 241. Accordingly, Judge Kaplan has concluded that "little is gained by attempting to distinguish an unprotectible 'idea' from

its protectible 'expression' in a photograph or other work of visual art." *Mannion,* 377 F.Supp.2d at 459. While the elusiveness of that distinction has not caused the Second Circuit to jettison the traditional approach, the distinction does explain why the Second Circuit has found no inconsistency between the need to focus judicial eyes on the interplay of visual elements and the more discerning observer test. Accordingly, if the total concept and feel inquiry requires keeping an eye on the works as a whole, the inquiry must be made with another eye on the medium of the works at issue.

A film is not a work that is easily divided into "neat layers of abstraction in precisely the same manner one could with a text." *Sapon,* 2002 WL 485730, at *3. Indeed, some of the magic of the movies may indeed be the way that a film combines a wide variety of narrative, visual, and aural elements—lighting, camera angles, dialogue, sound, music, scenery, acting, and even special effects. And it is the combination of these disparate elements in a particular way that turns the otherwise innocuous into the iconic. Neither the idea of a boy befriending an alien, nor a camera shot of an object shadowed by the moon, nor a flying bike, nor the individual notes of the score for *E.T.* are protectible, but that hardly means that the scene of Eliot flying with his extraterrestrial friend is not original. The scene would not be *that* scene if the elements were not combined just so. And yet, at the same time, unlike many visual works, films are also narratives whose scenes and characters can be disaggregated and compared to scenes and characters in other works. It is one thing to say that each element of a work affects the other and contributes to the whole, but it is quite another to say that the elements of a work are subsumed into the whole. In watching the *E.T.* scene, we may lose ourselves in the cinematic effect, but we also able to isolate the character development and plot.

This unique quality of the film medium—part narrative, part visual—gives Canal+'s emphasis on the so-called composite victim some surface appeal. Yet the same ineffable quality also makes the singularity of Canal+'s emphasis somewhat misplaced. A film is a film because all the elements work together, but Canal+ asks the Court to examine just the device that is similar. Canal+ appears to justify that myopia by arguing that the "composite portrait is the most important single 'element' in defendants' musical as in the Film" and "what most people remember about the Film." (Pl's Opp'n at 10, 22). Perhaps so, but the question here is not whether most people would remember what all critics agree is a *tour de force* by Sir Alec Guinness, but whether a discerning observer having viewed both works, "unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Yurman Design, Inc.,* 262 F.3d at 111 (quotation marks omitted). Where Canal+ contends that the composite victim is "bound together in an inseparable unity with all of the [F]ilm's other elements," the total concept and feel inquiry cannot be conducted with "good eyes and common sense" without considering all the elements that make the film the Film. *Gaito,* 602 F.3d at 66.

The most important element, of course, is the story itself. Indeed, absent the unprotectible story of a disinherited aristocrat murdering all of the heirs between himself and a dukedom, the creators of the Film who decided to have Guinness play multiple roles would have had nothing to transform. Yet an observer who overlooked the story to focus on the multiple role convention would scantly be believed to have seen the work at all rather than

merely the current DVD cover showing Sir Alec Guinness playing all eight victims. Hence the story is not merely a canvas on which the device of using one character to play multiple roles paints with comic strokes. Rather, the story itself is a large part of the work's total concept and feel.

It is also notable that an observer following the story of each work could not fail to notice that the works—to the extent that they differ from the Novel—have different endings that reflect the works' different comedic registers. In the Musical, the protagonist is accused of murdering the head of the family, a murder which, unbeknownst to the audience, has actually been committed by Miss Shingle. In the Film, the protagonist is charged with murdering Lionel whom, after the somber and pitiful scene in which he has pled for the protagonist's help and then attacked him, it seems clear has committed suicide. In the Musical, Sibella and Phoebe jointly hatch a plan to free the protagonist and their exit—each with one arm on the protagonist's, shaking hands behind his back with a knowing nod—suggests they are content to share his affections, a somewhat salacious twist on the happily ever after ending. In the Film, however, the plan that saves the protagonist is an extortion of one life for another. In the Musical, in an entirely absurd *deus ex machina,* Miss Shingle confesses to the murder. And the protagonist's distant cousin adds levity to the prospect of another series of murders. The Film, however, fades to black with two foreboding cliffhangers: will the protagonist be convicted on the basis of his memoirs that he has left in his cell, and will he murder Edith to repay Sibella for saving the very life she endangered with false accusations? In short, the end of the Musical is absurd and light-heartedly scandalous; the end of the Film is cruel, dramatic, and hardly comedic at all.

The same is true of the works writ large. Indeed, there is merit to Defendants' characterization of the Film as "a subtle, dark Wildean comedy, with some truly sinister scenes (such as the point-blank execution of the [head of the family])" to which they contrast the Musical as "a far lighter, broad comedy, filled with several bawdy scenes and riotous musical numbers." (Defs.' Br. at 22.) Many elements of the Film—the cliff-hanger ending, scenes of violence, Lionel's drunken plea, Sibella's extortion—are dramatic rather than comedic. To the extent that the Film is a comedy, it achieves that effect largely through dry wit, deadpan timing, deliberate understatement, and overplayed British class tropes: the dandified upward male climber of a protagonist; the curmudgeonly and reactionary *paterfamilias;* the young aristocrat more interested in the arts than in his wife; the stodgy, nostalgic general; the liquored up clergyman; the philandering profligate; the admiral who puts duty over sanity; and the rabblerousing suffragette. In short, the Film is at most tongue-in-cheek.

The Musical, however, sticks its tongue out. It is a bawdy, slapstick comedy. Where the Film is subtle, the Musical is campy. The songs use barely disguised sexual innuendo, parody modern tropes such as physical fitness fanatics, and ascribe to the aristocracy views of the poor and of Africans that are so exaggerated that they would be offensive if they were not so obviously mocking. And however improbable they may be, the murders in the Film involve largely realistic means—bombs, poison, firearms—but the murders in the Musical are unbelievable to the point of farce: attracting a swarm of bees, sending a Ferris wheel out of control, cannibalism, and sabotage in the weight room are meant to be funny because they are so absurd.

As can be seen from the foregoing, the total concept and feel of the Film is a dark comedy/drama about a disinherited heir who murders his relatives to obtain the baronetcy, while that of the Musical is a bawdy, over-the-top send-up of the same (unprotectible) plot. That both works employ the convention of using a single actor to play all the victims may add to the amusement, but it is hardly the "heart and soul" of each work. At their core, each rendition presents a radically different aesthetic placing one outside the copyright protection of the other.

The Second Circuit has explicitly cautioned that the " 'total concept and feel' standard may 'invite an abdication of analysis,' because 'feel' can seem a 'wholly amorphous referent. . . .' " *Tufenkian Imp. /Exp. Ventures, Inc.*, 338 F.3d at 134 (quoting 4 Nimmer on Copyright § 13.03[A][1][c] (2003)). In order to avoid the possibility that "a copyright doctrine whose aspiration is to protect a work's 'concept' could end up erroneously protecting 'ideas,' " or something else unprotectible, the Court of Appeals "has taken care to identify precisely the particular aesthetic decisions—original to the plaintiff and copied by the defendant—that might be thought to make the designs similar *in the aggregate.*" *Id.* (emphasis added). Canal+ describes that precise aesthetic decision as using one actor to play multiple roles in the serial murder story described in the Novel. But as described above, an actor playing all the roles of the victims does not make the two works "similar in the aggregate" because they are different kinds of comedies, each with a different total concept and feel.

In this regard, *Rodriguez v. Heidi Klum Company, LLC*, No. 05–CV–10218, 2008 WL 4449416 (S.D.N.Y. Sept. 30, 2008) is instructive. *Rodriguez* involved two reality television shows depicting competitions between budding fashion designers: *American Runway*, the allegedly infringed work, and *Project Runway*, the allegedly infringing work. Both works used unprotectible elements such as "a panel of judges composed of fashion industry experts, a design workroom with sewing machines, a specific number of contestants, professional models, hairstylists, make-up artists, weekly episodes and the setting of New York. . . ." *Id.* at *5. By combining these elements common to other reality television shows, both works transformed the unprotectible "idea of a reality television show where people compete for a prize—a basic staple of modern television programming"—into a fashion competition show. *Id.* at *4. Yet each work also used elements that the other did not to create fashion competitions that felt very different.

In *American Runway*, "aspiring fashion designers compete[d] to create the best moderately priced clothing line for a 'Real American Man or Woman'; viewers' votes counted in determining which contestants advanced to the next round; and [t]he majority of episodes took place in front of a live studio audience, with whom an attractive and comedic semi-celebrity host interacts throughout the episodes." *Id.* at *5. In *Project Runway*, however, "the contestants compete[d] in unrelated elimination challenges each week without regard for whether or not their clothing would ever be marketable to consumers"; "[t]he American public has no say in elimination decisions, which are made exclusively by a panel of judges"; and "aside from the finale in Bryant Park, Project Runway does not feature a live audience or a comedic host who interacts with the public." *Id.* As a result, the court found that

the concept, feel and theme of *Project Runway* are plainly distinguishable from those of *American Runway*. *Project*

*Runway* does not ostensibly bend to its audience; the viewer is given a glimpse into the world of high fashion and is allowed to watch the fashion elite decide which of the contestants deserves admission into their exclusive enclave. *American Runway* is much more populist and inclusive; the viewer has a powerful voice in the outcome of the show, and the program caters to engaging the fashion sensibilities of its "real American" audience.

*Id.* at *6. *Cf. Cabell v. Sony Pictures Entm't, Inc.,* 714 F.Supp.2d 452, 461 (S.D.N.Y.2010) ("Moreover, the concept and feel of the Blonde Works are distinct from the Zohan film. The Jayms Blonde stories are parodies of the James Bond stories, and much of the humor is double entendre and innuendo. In contrast, *You Don't Mess With the Zohan* derives much of its humor by exaggerating Arab and Israeli stereotypes. For example, Israelis' purported affinity for humus is the subject of many sight gags throughout the film."). It is just so here: both works use the same device to transform an unprotectible idea, but both works also combine the device with other elements to create works that are comedic in different ways and for different reasons.

■ In sum, copyright infringement requires substantial similarity between protectible aspects of the allegedly infringing and infringed works. Both works use one actor to play multiple roles, but under the discerning observer test, that device is not protectible. And however protectible a combination of elements might be under the total concept and feel test, the works do not have a similar feel. Canal+ would have the Court apply a kind of intermediate test that examines not the elements alone or the works in their entirety but only one aspect of those works: how the decision to portray characters in a story

interacts with that story. At bottom, however, that inquiry merely asks how parts have been acted. As applied here, that amounts to an argument that Sir Alec Guinness's *tour de force* is protectible. But it is no more protectible than Charles Laughton's Henry VIII or Sir Laurence Olivier's Hamlet. *See Supreme Records, Inc. v. Decca Records, Inc.,* 90 F.Supp. 904, 909 (S.D.Cal.1950). The performance may never be equaled, but that does not mean nobody has the right to try.

At first blush, the foregoing may suggest that a famous film has very little copyright protection, a result that may initially appear odd in a case where (a) Defendants apparently believed that the Film's copyright was worth giving Canal+ an exclusive option on the Musical; and (b) the two works appear similar in many respects. As to the first issue, the Court is not in a position to know whether Defendants' actions were the result of their genuine belief that the Film had more protection than they now contend or a belt-and-suspenders approach and the answer to that question cannot change the result.

As to the second issue, the discerning observer test instructs that similarities attributable to unprotectible elements may as well not be similarities at all. Canal+ owns the copyright to a comedic adaptation of a novel in the public domain, that is, an interpretation of an unprotectible story that is free for the taking. Thus almost all of the similarities between the two works are unprotectible and the two works might as well be totally different. It would be a strange result if the total concept and feel inquiry changed that conclusion merely because the Film mostly consists of unprotectible elements. And it would be an incorrect result in a case where Defendants combined one common but unprotectible element—an actor playing multiple roles—with other original elements to cre-

ate a different comedic interpretation of a novel that Canal+ does not own. However famous the Film is, its creators' original contribution was limited to the way in which they employed the varied elements of cinema—themselves unprotectible—to put their interpretation of that story on the screen. Accordingly, the scope of their copyright—and therefore their right to prevent others from unauthorized copying—extends only to works approximating a reproduction of the essential elements of the Film, that is, a work with a substantially similar total concept and feel. But no reasonable jury would find that that description fits Defendants' Musical. Accordingly, the copyright claim must be dismissed.

## B. Breach of Contract Claim

Canal+ also alleges that Defendants' adaption of the Musical would breach the Agreement. Defendants argue that this claim is preempted by the Copyright Act.

 "When Congress amended the Copyright Act in 1976, it provided for the preemption of state law claims that are interrelated with copyright claims in certain ways." *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997). Pursuant to 17 U.S.C. § 301, "[t]he Copyright Act exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act ... and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law...." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir.2004). The first requirement, the "subject matter requirement," "is satisfied if the claim applies to a work of authorship fixed in a tangible medium of expression and falling

within the ambit of one of the categories of copyrightable works," including "motion pictures" and works "based on preexisting works." *Id.* That requirement is satisfied here: Canal+ alleges that the Musical is based on the Film, a preexisting work.

 The second requirement, the "general scope requirement," presents a considerably more difficult question. This requirement "is satisfied only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." *Id.* (citing *Computer Assocs. Int'l*, 982 F.2d at 716). That is, (1) "the state law claim must involve acts of reproduction, adaptation, performance, distribution or display"; and (2) "the state law claim must not include any extra elements that make it qualitatively different from a copyright infringement claim." *Briarpatch Ltd.*, 373 F.3d at 305. As to the "extra element" requirement, courts examine "what [the] plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." *Computer Assocs. Int'l*, 982 F.2d at 716. Yet the Second Circuit has held that courts must "take a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *Briarpatch Ltd.*, 373 F.3d at 306.

"The Court of Appeals has not addressed whether the promise inherent in every contract is sufficient to establish an 'extra element.'" *BroadVision Inc. v. Gen. Elec. Co.*, No. 08–CV–1489, 2008 WL 4684114, at *4 (S.D.N.Y. Oct. 15, 2008). And "[c]ourts in this district have continued to disagree how to analyze preemption of breach of contract claims." *BanxCorp v. Costco Wholesale Corp.*, 723 F.Supp.2d

596, 614 (S.D.N.Y.2010).[5] Some courts, following *Architectronics, Inc. v. Control Systems, Inc.*, 935 F.Supp. 425 (S.D.N.Y. 1996) (Mukasey, J.), have held that "the 'extra element' that saves a contract claim from preemption is the promise itself." *Id.* at 439 (quoting *Brignoli v. Balch Hardy & Scheinman, Inc.*, 645 F.Supp. 1201, 1205 (S.D.N.Y.1986)). *See BanxCorp*, 723 F.Supp.2d at 614–617 (Karas, J.) (claim that licensee distributed and used copyrighted financial indexes in breach of limited, non-transferable license was not preempted); *eScholar, LLC v. Otis Educ. Sys., Inc.*, 387 F.Supp.2d 329, 332–33 (S.D.N.Y.2005) (claim that licensee failed to pay royalties or permit licensor audits under an agreement licensing a copyrighted data compilation was not preempted); *Sharp v. Patterson*, No. 03–CV–8772, 2004 WL 2480426, at *7–*8 (S.D.N.Y. Nov. 3, 2004) (Lynch, J.) (claim that author used scenes written by plaintiff without attribution or compensation as allegedly required by an agreement between them was not preempted); *Grauer v. Deutsch*, No. 01–

---

**5.** Other Courts of Appeals are also divided on this issue. Some circuits have found contract claims preempted, particularly where the contractual rights as issue were identical to or derivative of rights conferred by the Copyright Act. *See, e.g., Montz v. Pilgrim Films & Television, Inc.*, 606 F.3d 1153, 1158 (9th Cir.2010) ("[T]he plaintiffs' expectation of profits and credit was premised on the fact that they would retain control over their work, whether in partnership with the defendants or not. The plaintiffs' right to receive a share of the profits and credit is thus merely derivative of the rights fundamentally at issue: the plaintiffs' exclusive rights to use and to authorize use of their work."); *Ritchie v. Williams*, 395 F.3d 283, 287–88 (6th Cir. 2005) ("The claims are that Kid Rock licensed the songs he had written to others in violation of the copyrights and the performance and distribution rights of the Williams group. All of these claims are 'equivalent' to infringement claims. There is no meaningful 'extra element,' as some of the cases have put it, that removes the reformulated claims from the policy of national uniformity established by the preemption provisions of § 301(a)."); *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 457 (6th Cir.2001) ("If the promise amounts only to a promise to refrain from reproducing, performing, distributing or displaying the work, then the contract claim is preempted.").

Other circuits, however, have endorsed the view that a promise is an "extra element." *See, e.g., Utopia Provider Sys., Inc. v. Pro–Med Clinical Sys., L.L.C*, 596 F.3d 1313, 1327 (11th Cir.2010) ("To succeed on its breach of contract claims, Utopia must prove a valid license agreement, which constitutes an 'extra element'.... The rights Utopia asserts, therefore, are not 'equivalent to' exclusive rights under section 106, as required for preemption...."); *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1318–19 (11th Cir.2001) ("The rights sought to be enforced in Law Bulletin's breach of contract claim are not equivalent to the exclusive rights of § 106, and, in order to succeed on its claim, Law Bulletin needed to show an extra element, the existence of a valid contract between the parties."); *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453–55 (7th Cir.1996) (holding that an action to enforce a restriction on duplication in a so-called "shrinkwrap license" on the packaging of copyright software was not preempted); *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir.1990) ("This action for breach of contract involves an element in addition to mere reproduction, distribution or display: the contract promise made by Taquino, therefore, it is not preempted."). *Cf. Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 431 (8th Cir.1993) ("We conclude that the alleged contractual restriction on National's *use* of the licensed programs constitutes an extra element in addition to the copyright rights making this cause of action qualitatively different from an action for copyright.") (emphasis supplied); *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir.1988) ("Implicit in the contract between Acorn and Swantz was an agreement that while Swantz did not have to use Acorn's plans, if he did use Acorn's plans then he was obligated either to purchase the plans from Acorn or to purchase his building materials from Acorn.... Acorn's cause of action is based upon this implicit provision of the contract which does not arise out of the subject matter of copyright and is therefore a separate and distinct cause of action.").

CV–8672, 2002 WL 31288937, at *2 (S.D.N.Y. Oct. 11, 2002) (Kaplan, J.) (claim to attribution as co-author pursuant to an agreement was not preempted); *Katz Dochrermann & Epstein, Inc. v. Home Box Office*, No. 97–CV–7763, 1999 WL 179603, at *4 (S.D.N.Y. Mar. 31, 1999) ("KDE's allegation that HBO made an implied promise to pay for its idea is entirely separate and apart from any claim for copyright infringement involving the literary work. The court finds that KDE's claim for breach of implied promise to pay is not preempted."); *Architectronics*, 935 F.Supp. at 439–441 (claim that licensee released software based on copyrighted code that was the subject of a limited, exclusive license requiring royalty payments was not preempted). *Cf. Cf. Gusler v. Fischer*, 580 F.Supp.2d 309, 319 (S.D.N.Y.2008) (claim for violation of nondisclosure agreement was not preempted because it was "premised on the existence of allegations beyond mere reproduction, [wa]s qualitatively different from the copyright infringement claim, and, therefore, [wa]s not preempted"); *Smith v. Weinstein*, 578 F.Supp. 1297, 1307 (S.D.N.Y. 1984) ("A party may by contract agree to pay for ideas, even though such ideas could not be protected by copyright law. Rights under such an agreement are qualitatively different from copyright claims, and their recognition creates no monopoly in the ideas involved.").

Other courts, however, following *American Movie Classics Company v. Turner Entertainment Co.*, 922 F.Supp. 926 (S.D.N.Y.1996), have held that "a breach of contract claim is preempted if it is merely based on allegations that the defendant did something that the copyright laws reserve exclusively to the plaintiff (such as unauthorized reproduction, performance, distribution, or display)." *Id.* at 931. *See BroadVision*, 2008 WL 4684114, at *4 (claim that licensee of copyrighted software had exceeded usage limits under non-exclusive license agreement was preempted because "it does not allege that [defendant] breached a promise to pay, to allow an audit, or any other promise"); *Price v. Fox Entm't Group, Inc.*, 473 F.Supp.2d 446, 460–61 (S.D.N.Y.2007) (Scheindlin, J.) (claim that author failed to pay profits and attribute passages to the plaintiff was preempted in contrast to *quantum meruit* claim for "compensation for work [plaintiff] contributed to the screenplay that could, in theory, be considered separate and apart from ownership" and was "not necessarily preempted"); *eScholar LLC*, 387 F.Supp.2d at 332–33 (adopting recommendation that claim that licensee violated limits in exclusive license on distribution and reproduction of copyrighted work was not preempted); *Grauer*, 2002 WL 31288937, at *2 (claim for share of proceeds from co-authored work was preempted); *Cooper v. Sony Records Int'l*, No. 00–CV–233, 2001 WL 1223492, at *5 (S.D.N.Y. Oct. 15, 2001) (claim that licensee producer of music copyrighted in plaintiff artists' names had exploited music beyond scope of license was preempted); *Am. Movie Classics Co.*, 922 F.Supp. at 926, 931–2 (claim that licensor copyright owner showed films that had been exclusively licensed for showing by the plaintiff was preempted); *Smith*, 578 F.Supp. at 1307 ("To the extent plaintiff rests his contract claim not on breach of the terms of the contract but on Weinstein's having copied his property, the KKK script, in making 'Stir Crazy,' it is of course preempted.").

■ "The crux of the dispute between the parties, therefore, is whether the promise inherent in any agreement, by itself, provides the extra element necessary to make a breach of contract claim qualitatively different from a copyright infringement claim." *eScholar, LLC*, 387 F.Supp.2d at 332. The Court finds that

while the answer might be yes in some cases, in the circumstances of this case, the answer is no.

■ In reaching that conclusion, the Court begins from the premise that whether contract claims are preempted by the Copyright Act does not lend itself to a bright-line rule. Rather, whether a given contractual promise renders a claim qualitatively different than a copyright claim must depend on what the promise is. The Second Circuit has instructed that preemption turns on "what [the] plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." *Computer Assocs. Int'l*, 982 F.2d at 716. A categorical rule that "the extra element that saves a contract claim from preemption is the promise itself," *Architectronics*, 935 F.Supp. at 439, provides mere lip service to that instruction. As the court in *American Movie Classics Company* seemed to grasp, without referring to what the defendant has promised, a court cannot determine whether, by allegedly breaking the promise, the defendant has engaged in conduct for which the Copyright Act already provides the defendant relief:

> [A] breach of contract claim is preempted if it is merely based on allegations that the defendant did something that the copyright laws reserve exclusively to the plaintiff (such as unauthorized reproduction, performance, distribution, or display). However, if the breach of contract claim is based on allegations that the parties' contract creates a right not existing under copyright law—a right based upon a party's contractual promise—and the plaintiff is suing to protect that contractual right, then the claim is not preempted.

922 F.Supp. at 931. *Cf. Smith*, 578 F.Supp. at 1307 ("To the extent plaintiff rests his contract claim not on breach of the terms of the contract but on Weinstein's having copied his property ... it is of course preempted.... But plaintiff also claims that Weinstein agreed, expressly or implicitly, to pay him for the value of his ideas if she decided to use them.... Rights under such an agreement are qualitatively different from copyright claims, and their recognition creates no monopoly in the ideas involved.").

Indeed, the leading treatise on copyright law endorses the position that "pre-emption should be found absent to the extent that a breach of contract cause of action alleges more than simply reproduction (or adaptation, distribution, *etc.*) of a copyrighted work." 1 Nimmer on Copyright § 1.01[B][1][a][i]. That treatise argues that "causes of causes of action ... denominated [as contract claims] at times may essentially allege nothing other than derogation of rights under copyright." *Id.* In those cases, "a breach of contract cause of action can serve as a subterfuge to control nothing other than the reproduction, adaptation, public distribution, etc. of works within the subject matter of copyright. Those instances are to be deemed preempted." *Id.* § 1.01[B][1][a][iii].

That position makes sense because a rule that "the extra element that saves a contract claim from preemption is the promise itself," *Architectronics*, 935 F.Supp. at 439, seems hard to square with the Second Circuit's instruction to "take a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *Briarpatch Ltd.*, 373 F.3d at 306. The Second Circuit's "restrictive" posture seems directed at ensuring that elements are not treated as talismans but rather as indicia of overlap between the claimed relief and the relief available under the Copyright Act. Indeed, the language of the Copyright

Act refers not to elements of state law claims as such but rather to state law "*rights* that are equivalent to *any* of the exclusive *rights* within the general scope of copyright. . . ." 17 U.S.C. § 301(a) (emphasis added); *see also Computer Assocs. Int'l,* 982 F.2d at 716 ("Section 301 thus preempts only those state law rights that may be abridged by an act which, in and of itself, would infringe one of the exclusive rights provided by federal copyright law.") (quotation marks omitted). Consistent with this focus on the scope of rights rather than counting elements, the Second Circuit has found that the mere existence of an extra element such as intent does not render a claim qualitatively different for purposes of copyright preemption. *See Briarpatch Ltd.,* 373 F.3d at 306. There is no reason why the element of a promise should be any different.

In endorsing a contrary rule, several courts in this district have relied on *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1453–55 (7th Cir.1996) in which Judge Easterbrook, writing for a panel of the Seventh Circuit, held that an action to enforce a restriction on duplication in a so-called "shrinkwrap license" on the packaging of copyright software was not preempted. Judge Easterbrook reasoned that contractual rights were not "equivalent to any of the exclusive rights within the general scope of copyright" because "[a] copyright is a right against the world" whereas contracts "generally affect only their parties; strangers may do as they please, so contracts do not create 'exclusive rights.' " *Id.* at 1454. In addition, noting that "[t]erms and conditions offered by contract reflect private ordering, essential to the efficient functioning of markets," Judge Easterbrook expressed concern that finding no preemption would render unenforceable license restrictions on the use of and promises to pay for intellectual property. *Id.* at 1454–55.

In the Court's view, the *ProCD* decision does not go nearly as far as courts in this district have taken it. For one, the Seventh Circuit found "it prudent to refrain from adopting a rule that anything with the label 'contract' is necessarily outside the preemption clause: the variations and possibilities are too numerous to foresee." *Id.* at 1455. Accordingly, *ProCD* does not stand for the proposition that preemption is unwarranted in all breach of contract cases. Furthermore, Judge Easterbrook's concern about disrupting efficient markets seems most warranted where, unlike here, the plaintiff has bargained for a promise to do something the Copyright Act does not require—for example, to pay royalties from, to attribute co-authorship of, or to prevent disclosure of copyrighted material. But the concern seems far less pressing where the defendant has merely breached a promise not to distribute copyrighted material. Such a promise is hardly unenforceable if the material is in fact copyrighted, since the plaintiff could always seek relief under the Copyright Act. Nor would proceeding under the Act vitiate the parties' attempt at private ordering since "[a] valid license . . . immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor." *Davis v. Blige,* 505 F.3d 90, 100 (2d Cir. 2007); *see also United States Naval Inst. v. Charter Commc'ns, Inc.,* 936 F.2d 692, 695 (2d Cir.1991) ("[A]n exclusive licensee of any of the rights comprised in the copyright, though it is capable of breaching the contractual obligations imposed on it by the license, cannot be liable for infringing the copyright rights conveyed to it."). In fact, a plaintiff might even be better off forcing an alleged infringer to raise licensure as an affirmative defense. Although, like a contract plaintiff who bears the burden of proving a breach, "the copyright

owner bears the burden of proving that the defendant's copying was unauthorized," *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir.1995), unlike in a contract action where the plaintiff must prove the existence of a contract, in a copyright action "the burden is on the alleged infringer to prove the existence of the license." *Tasini v. New York Times Co., Inc.*, 206 F.3d 161, 171 (2d Cir.2000).

In any event, there is no reason why preemption should not apply with respect to the particular promise at issue here. Canal+ alleges that Defendants have breached a promise to "cease dealing in and with any materials written or created by [them] which represent, incorporate or embody the Film or any elements in the Film, including without limitation, the text, characters, and situations in the Film, all of which elements shall be deemed to have reverted to [Canal+]." (Compl. ¶ 23; Slotnick Dec. Ex. E at 2.) In effect, Canal+ alleges that it licensed the rights to a musical adaption of the copyrighted Film for a term not to exceed one year from the date that Canal+ declined to produce the Musical, at which point the exclusive right to any adaption of the Film reverted to Canal+. However, that exclusive right flowed from the Copyright Act, not from the Agreement. Thus the claim that Defendants usurped the exclusive right of Canal+ to adapt the Film is nothing more than a claim that Defendants have violated a right of Canal+ under the Copyright Act. Labeling that claim as one for breach of contract cannot change the fact that the claim is not "qualitatively different from a copyright infringement claim." *Briarpatch Ltd.*, 373 F.3d at 305. Rather, the claim merely alleges that Defendants have committed "an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." *Id.* Accordingly, the Copyright Act preempts the claim that Defendants' adaption is a breach of contract and that claim is dismissed.

### CONCLUSION

For the foregoing reasons, Defendants' motion [18] to dismiss the complaint in this action is GRANTED. Plaintiff's motion [9] to disqualify Defendants' counsel is DENIED as moot. The Clerk of Court is directed to close this case.

SO ORDERED.